**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **RANDEL RAY MCCULLOUGH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 09-CV-417-PJC |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Claimant, Randel Ray McCullough ("McCullough"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. McCullough appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that McCullough was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

At the time of the hearing on April 8, 2008 before the ALJ, McCullough was 50 years old. (R. 32). He completed high school and attended some college, without obtaining a degree. (R. 33). He had attended vocational educational training for his airframe and powerplant license. *Id.* He got that license in 1992. (R. 37). His last day of work was in June 2006 with a utility location

contractor. (R. 34). He left the job after around three months because it was too physically demanding. *Id.* The equipment weighed about 40 pounds, and he could not meet the physical demands of getting in and out of the truck, walking, stooping, and carrying the equipment. *Id.*

He previously worked for the City of Tulsa wastewater treatment plant for a few months before he was fired due to problems with his neck. (R. 35). He had previously worked doing aircraft assembly, but had also been off work for some time due to workers compensation proceedings. (R. 37). From 1995 to 2002, he worked for American Airlines as a mechanic. *Id.*

McCullough's main reason for not being able to work was pain. (R. 38). He said he had no use of his hands, including weakness in his arms. (R. 38-39). He had numbness and tingling in both hands, with no sensation in his first digits of each hand. (R. 42). The symptoms were tied to nerve damage in his neck. *Id.* He testified that he would not have difficulty picking up objects from a table. (R. 42-43). He said that he would have trouble reaching or working overhead. (R. 43-44). Two doctors had told him he had carpel tunnel syndrome. (R. 54-55).

He could not stand for long due to problems with his left ankle. (R. 38). He broke the ankle in 2004 and had surgery that included pins and a plate. (R. 41). The ankle hurt all of the time, and it caused problems with walking, standing, squatting, and balancing. (R. 41, 55). He did not usually use a cane, but did when he walked his dogs. (R. 41-42).

McCullough testified that he could not sit for over 30 minutes because of problems with his neck and shoulders. (R. 39). He had pain when he moved his neck. (R. 44). He had previously had three surgeries on his neck that included hardware. *Id.* He had also had surgery on his left clavicle. (R. 54).

McCullough previously had two sinus surgeries and at the time of the hearing he still had drainage. *Id.* He threw up every morning due to phlegm. (R. 44, 53). His sinus issues also caused

him to get short of breath. (R. 40). McCullough testified that some of his respiratory problems were due to chlorine gas exposure at a previous job. *Id.* Dust, grass, fumes, or smoke would irritate him, and he coughed often. (R. 53).

McCullough estimated that he drove a car about ten miles a week. (R. 45). He had no difficulty operating the foot pedals, but he would have trouble with the steering wheel and hand operations on a long drive because he could not sit for more than an hour. *Id.* He had trouble looking from side to side while driving, but looking up at traffic signs did not create a problem. *Id.* His upper back bothered him, and the doctors thought it was related to the nerve damage in his neck. (R. 46).

McCullough could bend over to touch his knees, but he had to sit down to put on shoes or an action that required bending to his toes. *Id.* He could squat and get back up, but it was very difficult. *Id.* He could walk up and down one flight of stairs. *Id.*

McCullough's medications made him sleepy. (R. 47-48, 53-54). He took a prescription muscle relaxer and a prescription pain medication several times a day. (R. 53-54). He had tried hot showers, hot baths, ice packs, warm packs, massages, and acupuncture to relieve his symptoms. (R. 48). He did the dishes at home, and he and his son shared housework such as dusting, sweeping, mopping, and vacuuming. He did his own laundry, he cooked, and he shopped. (R. 48-49). He mowed his front yard, and his son mowed the bigger back yard. (R. 50). He described the front yard as "tiny," and he would sometimes use a paper mask to cut down on irritation from the grass and dust. (R. 53). He watched television, read, and visited with friends and family. (R. 49). He had gone fishing using a boat the year before the hearing, but he did not stay very long. (R. 49-50).

McCullough testified that he had trouble both with getting to sleep and staying asleep. (R. 50). During the day, he would nap, including after taking his pain medication. (R. 50-51). He could

3

sit for about 30 minutes, stand for about 10 or 15 minutes, and walk for about 30 minutes. (R. 51). He could not lift a 40-pound bag of dog food, but he could lift a 20-pound bag of potatoes, using both hands. (R. 52).

McCullough's son testified at the hearing. (R. 57-59). The son lived with McCullough and observed him every day. (R. 57). He testified that his father spent most of his time lying down on the couch in their house. (R. 57-58). He said that his father limped due to the problems with his foot and that it was sometimes very difficult for his father to get up. (R. 58). He testified that it had been about a month since he had ridden in a car driven by his father, but his father had difficulty turning his neck while driving. (R. 59).

Records show that McCullough saw Christopher Chow, M.D. at Hillcrest Medical Group on July 18, 2004. (R. 215). Chronic neck pain was the first active problem listed, and a column for inactive problems listed McCullough's history of medical issues, including his previous neck and ankle surgeries. *Id.* A letter in Dr. Chow's files dated January 10, 2005 show a report from a physician who performed surgery to fix a "left clavicle nonunion." (R. 214). At that time, it was seven weeks after the surgery, and the surgeon was pleased with the results. *Id.* The surgeon advised that "nonunions" took longer to heal than primary fractures, and he would like for McCullough to "take it easy" as far as activities. *Id.* A further report dated June 27, 2005 also showed good results, with the surgeon encouraging McCullough to keep using the arm. (R. 213).

McCullough saw Dr. Chow again on August 9, 2005, at which time McCullough wanted assistance with his chronic pain after leaving the care of the surgeon, including a referral to a pain specialist. (R. 206-07). Dr. Chow noted that McCullough was trying to find another job because his current job included assembly, painting, and riveting, and it had worsened his symptoms since he had returned in March. (R. 206). On examination, Dr. Chow found 5/5 muscle strength in

4

McCullough's shoulders, with tenderness in the clavicular area on the left side. *Id.*

On August 25, 2005, McCullough was seen for a consultation with the office of a pain specialist, Dr. Sorenson, and his history of neck, ankle, and clavicle surgeries was recited in the consultative report. (R. 209-12). McCullough reported chronic pain, with his pain being a "7" on a scale of 1 to 10 at the time of the consulting examination. (R. 209). On examination, McCullough had spasms and tenderness in the cervical region, with a positive Spurling's test on the left, as well as some upper thoracic spasms. (R. 210). He had positive Tinel's sign at both wrists with weak thumb opposition. (R. 211). His ankle had a decreased range of motion, and McCullough had thickening of the joints and hands consistent with osteoarthritis. *Id.* His neurologic examination was unremarkable, and McCullough's gait was normal. *Id.* Diagnostic impressions were failed cervical surgery syndrome; cervical radiculopathy; bilateral carpal tunnel syndrome; and osteoarthritis. Dr. Sorenson's office adjusted McCullough's pain and muscle spasm medications and stated that McCullough might benefit from a cervical epidural steroid injection. *Id.*

Acute abdominal imaging done on November 19, 2005 was unremarkable. (R. 227). Computed tomography imaging of the abdomen and pelvis with contrast showed four impressions, with the first being a likely hemoperitoneum[1] "most consistent with an occult splenic laceration." (R. 225-26). The second impression was a "[d]efect in the right crus of the diaphragm with herniation of minimal amount of fat superiorly." (R. 226). The third impression was possible appendicitis, although the reviewing physician found this less likely, and the fourth impression was diverticulosis. *Id.* Follow-up studies done on November 21, 2005 and December 7, 2005 showed

---

[1]"Effusion of blood into the peritoneal cavity."  Taber's Cyclopedic Medical Dictionary 878 (17th ed. 1993).

no change, and in the opinion of the reviewing physicians there was a decreased likelihood of abscess. (R. 221-24).

McCullough saw Dr. Chow on November 28, 2005, for a sinus infection and related symptoms. (R. 202-03). McCullough reported that he had quit his job and had been hospitalized from November 18-22, 2005 at Tulsa Regional Medical Center for the spleen-related symptoms reflected by the imaging studies. Dr. Chow noted that McCullough was to call his surgeon to see if he could lift 50 pounds for the City of Tulsa employment physical the next day. (R. 202-03). McCullough was seen for follow-up on December 12, 2005, and was referred again to Dr. Sorenson for pain relief. (R. 200-01).

McCullough was seen in Dr. Sorenson's office on January 3, 2006. (R. 292-93). He rated his pain as a "9." (R. 292). On examination, McCullough again had spasms and tenderness in the cervical region, positive Spurling's test on the left, and spasms in the upper thoracic area. *Id.* The remainder of the examination was the same as the August 25, 2005 examination, including the impressions. (R. 293). McCullough was scheduled for a cervical epidural steroid injection, and his medications were adjusted. *Id.* At a follow-up appointment on February 6, 2006, McCullough reported that he had not received much benefit from the steroid injection, and he rated his pain as a "7." (R. 288). His pain medications were increased. (R. 289). At follow-up appointments on March 13 and April 13, 2006, McCullough reported that the increased medications had helped, and his medications were continued with no adjustments. (R. 281-82, 284-85). Records indicate that McCullough continued to see Dr. Sorenson's office through January 2008. (R. 344-49).

On June 21, 2006, McCullough saw Dr. Chow and reported that he was trying to get Social Security benefits because he could not work due to pain, even with increased pain medications. (R. 197).

A Physical Residual Functional Capacity Assessment was completed by non-examining agency consultant Judy Marks-Snelling, D.O., M.P.H. on August 14, 2006. (R. 235-42). Dr. Marks-Snelling found that McCullough had the exertional RFC to perform light work. (R. 236). In her explanation, Dr. Marks-Snelling cited McCullough's activities of daily living. *Id.* She also recounted McCullough's history of neck surgery and his 2005 and 2006 treatment history with Dr. Chow. (R. 236-37). She found a postural limitation in that McCullough could only occasionally stoop. (R. 237). She found no other limitations. (R. 238-42).

After the hearing, the ALJ ordered additional tests, including an EMG study dated May 8, 2008. (R. 355). This one-page report does not include much explanation of the results, but does state that there was "[e]vidence of bilateral chronic radiculopathy in C7-T1 distribution." *Id.* X-rays were taken on May 9, 2008, and one of his left hand showed moderate degenerative changes at the first metacarpal joint, but was otherwise unremarkable. (R. 356). The x-ray of McCullough's cervical spine showed the plate from C6 to C7 from the previous surgery and bony ankylosis of the C5, C6, and C7 vertebrae. (R. 356-57). There were no acute findings. (R. 357). The x-ray of McCullough's left shoulder showed an old healed fracture of his left clavicle, with no other findings. *Id.* The x-ray of his ankle showed the hardware from the previous surgery, and the reviewing physician described it as "complete bony union." (R. 358). There were no acute findings. *Id.*

Sri K. Reddy, M.D. FACPM&R, examined McCullough on June 16, 2008. (R. 362-68). He noted that Homans' sign was normal on his examination of McCullough's extremities. (R. 363). For the neurological examination, Dr. Reddy found that McCullough's strength in all extremities was 5/5, but McCullough had decreased sensory feeling of light touch in his first three digits of both hands. *Id.* Dr. Reddy noted tenderness over the cervical spine and scapular stabilizers. *Id.* Straight leg raising was normal. *Id.* McCullough's shoulders had positive signs of impingement. *Id.* Dr.

7

Reddy's impressions included neck pain, cervical disc disease, cervical spondylosis, decreased cervical spine range of motion, bilateral shoulder pain, bilateral shoulder impingement with rotator cuff tendonitis, and paresthesias in both hands from carpal tunnel syndrome. *Id.*

Dr. Reddy completed a Physical Medical Source Statement as part of his report. (R. 365-67). He indicated that McCullough could sit for 8 hours at one time, and 6 hours total in an 8-hour day. (R. 365). He found that McCullough could stand and walk for 2 hours at one time, and 1 hour total in an 8-hour day. *Id.* He found that McCullough could lift and/or carry 10 pounds frequently and 20 pounds occasionally. *Id.* Dr. Reddy said that McCullough had no limitations in using his feet, but was limited in both hands for grasping and fingering. (R. 366). McCullough could bend, squat, crawl, or climb frequently, but could only reach occasionally. *Id.* He had a moderate restriction to unprotected heights and being around moving machinery, but no restriction on temperature, exposure to dust, driving, or vibrations. *Id.* For the objective medical findings that supported his assessment, Dr. Reddy noted McCullough's clavicle surgery, his carpal tunnel syndrome, and his cervical disc disease. *Id.*

## Procedural History

McCullough filed an application on July 12, 2006 seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.*, alleging disability beginning June 27, 2006. (R. 113-15). According to the ALJ's decision, McCullough also filed an application seeking supplemental security income under Title XVI, 42 U.S.C. §§ 401 *et seq.* (R. 10). The applications were denied initially and on reconsideration. (R. 73-76, 80-85). A hearing before ALJ Gene M. Kelly was held April 8, 2008 in Tulsa, Oklahoma. (R. 26-69). By decision dated September 4, 2008, the ALJ found that McCullough was not disabled at any time through the date of the decision. (R. 10-25). On May 1, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of

8

the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981, § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[2] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

---

[2]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that McCullough met insured status requirements through December 31, 2010. (R. 12). At Step One, the ALJ found that McCullough had not engaged in any substantial gainful activity since his alleged onset date of June 27, 2006. *Id.* At Step Two, the ALJ found that McCullough had severe impairments of problems with his back, neck, left arm, left shoulder, hands, ankle, sinuses, and skin lesions. *Id.* At Step Three, the ALJ found that McCullough's impairments did not meet a Listing. (R. 13).

The ALJ determined that McCullough had the RFC to do light work, except:

> stand/walk for two hours out of an eight hour day, 30 minutes at a time; sit for six hours out of an eight hour workday, 30 minutes at a time, limited squatting and crawling, occasional bending, stooping, climbing, pushing/pulling, and reaching overhead with left upper extremity; slight limitation in fingering, feeling, and grasping and twisting of the head; avoid dust, fumes, and gases, uneven surfaces, unprotected heights, fast and dangerous machinery, temperature extremes, and sunlight.

(R. 14). At Step Four, the ALJ found that McCullough could not perform his past relevant work. (R. 15). At Step Five, the ALJ found that there were jobs that McCullough could perform, taking into account his age, education, work experience, RFC, and transferable work skills. (R. 16). Therefore, the ALJ found that McCullough was not disabled from June 27, 2006 through the date of his decision. (R. 17).

## Review

McCullough presents his arguments as errors in the ALJ's RFC and Step Five determinations. The undersigned finds that substantial evidence supports the ALJ's decision, and the decision complies with legal requirements. Therefore, the ALJ's decision is affirmed.

McCullough presents many statements regarding what the ALJ is required to do, without actually fashioning those statements into an argument.[3] His first developed argument is that the RFC did not include all of McCullough's limitations, and McCullough specifically references the August 25, 2005 evaluation in Dr. Sorenson's office, stating that McCullough had positive Tinel's and Spurling's tests at that time. Plaintiff's Amended Brief, Dkt. #16, p. 7. The ALJ adequately summarized the August 25, 2005 evaluation, although he did not specifically refer to the named tests. (R. 12-13). The ALJ listed the diagnostic impressions of failed cervical surgery syndrome, cervical radiculopathy, bilateral carpal tunnel syndrome, and osteoarthritis. (R. 13). The ALJ's summary of the August 25, 2005 report, including the diagnostic impressions, makes clear that he

---

[3] McCullough intersperses in his brief that the ALJ improperly interjected his own lay opinion. This argument is not a developed one that this Court can review in a meaningful way. *See Wall v. Astrue*, 361 F.3d 1048, 1066 (10th Cir. 2009) (perfunctory presentation of argument by claimant deprived the district court of the opportunity to analyze and rule on issue); *Zumwalt v. Astrue*, 220 Fed. Appx. 700, 776-77 (10th Cir. 2007) (unpublished) (waiver rules apply in Social Security disability context when issues are not sufficiently preserved).

considered that evaluation, and he did not impermissibly "pick and choose," as McCullough suggests.

Next, McCullough makes a factually incorrect argument that he was released to work on December 4, 2006 with a restriction of no use of his left arm or hand. Plaintiff's Amended Brief, Dkt. #16, p. 7. While the hand-written date on the cited document is not clear, and the date was incorrectly listed in the index as 2004, it is evident that the cited work release was part of McCullough's care after the 2004 surgery on his left clavicle. (R. 213-14, 350-54). Thus, while McCullough states that this was a work restriction given by a treating physician with no evidence that it was discontinued, in fact the surgeon released McCullough from his care on June 27, 2005. (R. 213). In the June 2005 letter to Dr. Chow, the surgeon said that McCullough was to do "whatever he can at this point, do not slow down, keep using his arms, keep using his body as he feels need be." *Id.* It is clear, then, that the ALJ did not err in failing to cite the work restrictions given in December 2004, because McCullough was indeed released from those restrictions well before his claimed onset date of June 27, 2006.

Next, McCullough complains that the ALJ did not adequately take into account that portion of Dr. Reddy's consultative report in which he indicated that McCullough was limited in both hands for repetitive grasping or fingering. (R. 366). Again, the undersigned finds the ALJ's discussion to be adequate. He first summarized Dr. Reddy's report by listing all of his impressions, including "parethesias in both hands (carpal tunnel syndrome)." (R. 13, 363). Later in his decision, the ALJ discussed McCullough's problems with his hands in more detail, noting that he had been diagnosed with carpal tunnel syndrome. (R. 15). He noted that McCullough had decreased sensation in his first three digits of both hands, but he also noted that Dr. Reddy had said that he could manipulate small objects and grasp tools. (R. 15, 364). In addition to this discussion, the ALJ's RFC

12

determination did not ignore the opinions of Dr. Reddy, but incorporated them by stating that McCullough had a "slight limitation in fingering, feeling, and grasping." (R. 14). Dr. Reddy's consultative examination stands as evidence that substantially supports the ALJ's RFC determination, and the ALJ's decision did not ignore Dr. Reddy's opinions, as McCullough asserts.

McCullough next asserts that the ALJ did not adequately take into account McCullough's subjective complaints and did not make a proper credibility analysis. Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

Here, the undersigned finds that the ALJ's credibility analysis is adequate, although the ALJ's discussion is minimal. The undersigned finds that the ALJ gave two specific and legitimate reasons for his credibility determination. The first was discrepancies between the testimony of McCullough and his son relating to McCullough's ability to walk and the treating medical evidence. (R. 15). The ALJ summarized the testimony that McCullough had difficulty walking and limped, and then juxtaposed it with specific treating records of Dr. Sorenson and Dr. Chow in which it was noted that McCullough's gait was normal. *Id.* The ALJ's second reason was discrepancies in the testimony regarding McCullough's activities of daily living. While his son testified that McCullough spent his time lying down on the sofa, McCullough had testified that he did housework,

13

laundry, dishes, cooking, mowing, and shopping. *Id.* The ALJ characterized these two examples as "significant discrepancies." *Id.* The ALJ's credibility determination was supported by specific reasons linked to substantial evidence, and the undersigned therefore finds that it should be affirmed. *Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points); *Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole the ALJ's findings regarding the claimant's testimony were "clear enough" and did not violate rule against *post hoc* justification).

While McCullough characterizes the remainder of his arguments as ones relating to the ALJ's Step Five determination, in reality they are duplicative of the arguments made relating to the ALJ's RFC determination. McCullough states that the hypothetical to the Vocational Expert did not relate with precision all of McCullough's limitations because the ALJ did not include sufficient restrictions on McCullough's use of his hands. Plaintiff's Amended Brief, Dkt. #16, pp. 10-11. McCullough urges that the job descriptions of the jobs as to which the Vocational Expert testified show that McCullough would not be able to perform those jobs, given his diagnosis of unresolved carpal tunnel syndrome. As previously discussed, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence, and therefore the hypothetical to the Vocational Expert that included all of those limitations was sufficient at Step Five to carry the Commissioner's burden. *See Talamantes v. Astrue*, 370 Fed. Appx. 955, 959 (10th Cir. 2010) (unpublished) ("In posing hypothetical questions to the VE, the ALJ is required to identify only those physical and mental impairments borne out by the evidentiary record."). McCullough's re-framing of his arguments as Step Five issues is not persuasive.

McCullough's case is one in which the undersigned may have made different conclusions

14

from those that the ALJ made, if his role had been one of a court of first instance, but that is not the Court's role here.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted). The Court will not engage in impermissible reweighing of the evidence or substitution of its judgment for that of the Commissioner. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 30th day of September, 2010.

_____
Paul J. Cleary
United States Magistrate Judge